**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| FEDERAL TRADE COMMISSION,<br>600 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20580<br><br>                            *Plaintiff*,<br><br>        v.<br><br>LOCKHEED MARTIN CORPORATION,<br>6801 Rockledge Drive<br>Bethesda, MD 20817<br><br>        and<br><br>AEROJET ROCKETDYNE<br>HOLDINGS, INC.,<br>222 N. Pacific Coast Highway, Suite 500<br>El Segundo, CA 90245<br><br>                            *Defendants*. | No. _____ CV _____<br><br>**FILED UNDER SEAL** |

## COMPLAINT

Plaintiff, the Federal Trade Commission ("FTC" or "Commission"), by its designated attorneys, petitions this Court for a preliminary injunction enjoining Lockheed Martin Corporation ("Lockheed") and its subsidiaries, from consummating its proposed acquisition (the "Proposed Acquisition") of Aerojet Rocketdyne Holdings, Inc. ("Aerojet"). The Commission seeks this relief pursuant to Section 13(b) of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 53(b), and Section 16 of the Clayton Act, 15 U.S.C. § 26. Absent such relief, Lockheed and Aerojet (collectively, "Defendants") have represented that they would be free to consummate the Proposed Acquisition after 11:59 p.m. on January 26, 2022.

Preliminary injunctive relief is imperative to preserve the *status quo* and to protect competition while the Commission adjudicates whether the Proposed Acquisition is unlawful. The Commission has already initiated the administrative trial, pursuant to Sections 7 and 11 of the Clayton Act, 15 U.S.C. §§ 18, 21, and Section 5 of the FTC Act, 15 U.S.C. § 45, by filing an administrative complaint on January 25, 2022.  Pursuant to FTC regulations, the administrative trial will begin on June 16, 2022.  Allowing the Proposed Acquisition to proceed would harm competition and undermine the Commission's ability to remedy the anticompetitive effects of the Proposed Acquisition if it is ultimately found unlawful after a full administrative trial on the merits and any subsequent appeals.

## NATURE OF THE CASE

1.      Lockheed, the world's largest defense contractor, proposes to acquire Aerojet, the last significant independent, and, in some instances sole, U.S. supplier of several critical missile propulsion products used as inputs in multiple weapon systems, for $4.4 billion (the "Proposed Acquisition").  If permitted, the Proposed Acquisition would allow the combined firm to use its control of Aerojet to harm Lockheed's rivals in ways that would substantially lessen competition in multiple markets for products critical to the national defense.

2.      The United States Department of Defense ("DoD" or the "Department") depends on prime contractors such as Lockheed to design, develop, and produce the weapon systems it requires to defend the United States.  Under DoD's acquisition system, a prime contractor is responsible for sourcing all necessary systems, subsystems, and components either internally or through sub-contracts with qualified outside suppliers.

3.      Lockheed currently competes against other firms, including Raytheon Technologies, Inc. ("Raytheon"), Northrop Grumman Corporation ("Northrop" or "NG"), and The Boeing Company ("Boeing"), for prime contracts to design, develop, and produce, all-up missile rounds and/or missile systems ("missiles"), missile defense kill vehicles ("KVs"), and/or hypersonic cruise missiles ("HCMs") (collectively, the "Relevant Products" and the "Relevant Markets") for DoD.  The competition among prime contractors for these important weapon systems has provided benefits to DoD including lower costs, enhanced quality, and greater innovation.

4.      After conducting an independent review of the Proposed Acquisition, DoD, the sole customer for the Relevant Products, has "concluded ███████████████████ ███████████████████████████████████████████████ ████████████████████.

5.      Aerojet is a premier provider of multiple critical inputs to the Relevant Products, including solid propellant rocket motors ("SRMs") for missile propulsion, divert-and-attitude control systems ("DACS") that provide the fast and precise maneuvering capabilities for the KVs used to intercept hostile ballistic missile threats, and air-breathing hypersonic propulsion systems, including, but not limited to, the supersonic combustion ramjets ("scramjets") that power HCMs (collectively, "Critical Propulsion Technologies").

6.      As a Lockheed executive summarized in Executive Talking Points about the Proposed Acquisition, "propulsion is an absolutely critical element for all future advanced missiles."  This executive further explained, ████████████████████████ █████████████████████████████████████████████.

███████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

7.      Aerojet is the only independent, and, in some instances sole, significant U.S.

supplier of the Critical Propulsion Technologies.  ████████████████████████

██████████████████████████████████████████

████████████████████████████████████████

███████████████

8.      Lockheed believed that the Proposed Acquisition ██████████████████

████████████████████████████  whereas, if Lockheed did not pursue

the acquisition, ████████████████████████████████████

9.      The Proposed Acquisition would reduce competition because it will provide

Lockheed with the ability and incentive to foreclose access to, or raise its rivals' cost for, the

Critical Propulsion Technologies.  Without access to these essential inputs, Lockheed's

competitors (and future potential competitors) would be seriously disadvantaged—if not

completely foreclosed—from competing for upcoming DoD prime contracts in the Relevant

Markets.  Short of refusing to sell or increasing the price of its in-house propulsion products, a

combined Lockheed-Aerojet could use multiple other mechanisms to disadvantage its

competitors that rely on these critical inputs to design, develop, and produce the Relevant

Products, such as making adverse personnel assignments and/or scheduling, investment, or

design decisions.

10.     Today, as a neutral merchant supplier, Aerojet has the incentive to (and in fact does) compete to supply the Critical Propulsion Technologies to all potential customers.  When a prime contract is up for bid, Aerojet currently possesses an incentive to support as many potential prime contractors as possible to maximize the probability that Aerojet will be the supplier of choice for the winning prime contractor.

11.     Before agreeing to purchase Aerojet, Lockheed sought unsuccessfully to prevent Aerojet from supplying Critical Propulsion Technologies to other prime contractors on a number of occasions. ███████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████ This is not the first time Lockheed made such an attempt. █████████████████████████████████████ ████████████████████████████████████████████ ██████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████████ ████████████

12.     If Lockheed acquires Aerojet, the combined firm will no longer have the same incentive to support its rival prime contractors.  For example, post-acquisition, Lockheed could earn substantially more by winning a DoD prime contract for a Relevant Product than it would from the sale of Critical Propulsion Technologies to a rival that won the prime contract.  Because

Lockheed will earn more if it wins the prime contract, it will have an increased incentive to refuse to sell to, or otherwise disadvantage (e.g., by failing to provide pre-acquisition levels of pricing, support, access, or research investment) its rival defense prime contractors in order to shift future prime missile contracts to Lockheed.

13.     The Proposed Acquisition will likely result in a decrease in certain research and development ("R&D") investment and innovation in the design, development, and production of missile propulsion systems.  Today, Aerojet collaborates closely and shares innovative ideas with all its major customers, including, but not limited to, Lockheed, Raytheon, Boeing, and Northrop.  Similarly, Aerojet invests its own resources in R&D to support competing propulsion concepts advanced by multiple prime contractors for a given missile program.  Given Aerojet currently is generally agnostic as to which prime wins a given contract (provided Aerojet is the supplier for the winner), Aerojet invests  in technologies that it expects will yield the most benefit to its propulsion business without regard to the identity of the prime contractor.  Post-acquisition, however, a combined Lockheed-Aerojet will no longer possess the same incentives with respect to R&D.  Post-acquisition, the combined firm will earn more if Lockheed wins the prime contract, and therefore, would have a diminished incentive to devote its resources toward otherwise beneficial, innovative R&D that would advantage Lockheed's rivals or diminish sales of competing Lockheed Relevant Products, ultimately inhibiting DoD's capability to defend the nation.

14.     A further anticompetitive effect of the Proposed Acquisition is that it presents new opportunities, and heightens the incentives, for Lockheed to misuse the competitively sensitive, non-public information of rival primes and propulsion suppliers in at least two ways. First, by acquiring Aerojet, Lockheed will gain access to competitively sensitive, non-public

information about its rivals' competing missile, KV, or HCM systems to which Aerojet was privy in its role as a supplier of the Critical Propulsion Technologies to those rival primes.  If such information is shared, whether intentionally or unintentionally, with Lockheed personnel working on a competing prime proposal, the information exchange could reduce competition for the relevant program.  Going forward, rival primes may also be inhibited from sharing necessary information with the former Aerojet propulsion business because they risk the loss of their proprietary information to Lockheed.  Second, Lockheed, in its current role as purchaser of Critical Propulsion Technologies, is likely to be privy to competitively sensitive, non-public information relating to Aerojet's only SRM rival, Northrop.  Post-acquisition, Lockheed would have an incentive that it did not previously have to exploit that proprietary Northrop information to gain an advantage for its newly acquired in-house propulsion business and to disadvantage Northrop in future SRM competitions.  Preventing such potential anticompetitive exchanges of information is necessary to maintain effective competition in the Relevant Markets to ensure that innovation, price, and/or performance for these important U.S. military systems is not negatively impacted.

15.     The Proposed Acquisition will substantially lessen competition in all Relevant Markets, likely impacting multiple consequential current and future missile procurement programs.  If the Proposed Acquisition is consummated, it will likely result in less innovation by Lockheed and other prime competitors, possible exit by Lockheed's prime competitors, increased barriers to entry in the downstream Relevant Markets, and higher cost and/or lower quality product for DoD.

16.     There are no countervailing factors sufficient to offset the likelihood of competitive harm from the Proposed Acquisition.  Neither new entry nor expansion by existing

market participants will be timely, likely, or sufficient in magnitude, character, and scope to deter or counteract the anticompetitive effects of the Proposed Acquisition.

17.     Nor can Defendants demonstrate substantiated, verifiable, cognizable, and merger-specific efficiencies that would reverse the Proposed Acquisition's likely significant anticompetitive effects in the Relevant Markets.

## JURISDICTION AND VENUE

18.     This Court's jurisdiction arises under Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), and under 28 U.S.C. §§ 1331, 1337, and 1345.  This is a civil action arising under Acts of Congress protecting trade and commerce against restraints and monopolies, and is brought by an agency of the United States authorized by an Act of Congress to bring this action.

19.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), provides in pertinent part:

Whenever the Commission has reason to believe

(1)     that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and

(2)     that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review, or until the order of the Commission made thereon has become final, would be in the interest of the public—the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practice. Upon a proper showing that weighing the equities and considering the Commission's likelihood of ultimate success, such action would be in the public interest, and after notice to the defendant, a temporary restraining order or a preliminary injunction may be granted without bond[.] . . .

20.     Defendants are, and at all relevant times have been, engaged in activities in or affecting "commerce" as defined in Section 4 of the FTC Act, 15 U.S.C. § 44, and Section 1 of the Clayton Act, 15 U.S.C. § 12.

21.     The FTC Act, 15 U.S.C. § 53(b), authorizes nationwide service of process, and personal jurisdiction exists where service is effected pursuant to federal statute.  Fed. R. Civ. P. 4(k)(1)(C).  Venue is proper in the District of Columbia under 28 U.S.C. § 1391(c)(3), as well as under 28 U.S.C. § 1391(c)(2).

## THE PARTIES AND THE PROPOSED ACQUISITION

22.     Plaintiff, the Federal Trade Commission, is an agency of the United States government, established, organized, and existing pursuant to the FTC Act, 15 U.S.C. §§ 41 *et seq.*, with its principal offices at 600 Pennsylvania Avenue, N.W., Washington, D.C. 20580.  The Commission is vested with authority and responsibility for enforcing, *inter alia*, Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.

23.     Defendant, Lockheed is a Maryland corporation headquartered at 6801 Rockledge Drive, Bethesda, Maryland 20817.  The largest defense contractor in the world, Lockheed reported net sales of over $65 billion in 2020, approximately 74 percent of which were from sales to the U.S. Government.  Lockheed employs approximately 110,000 people, with the vast majority located in the United States.  Lockheed's business is organized into four segments: Aeronautics, Missiles and Fire Control, Rotary and Mission Systems, and Space.  At least three of its business segments (Aeronautics, Missile and Fire Control, and Space) research, design, develop, integrate, produce, and/or sustain various classified and unclassified advanced missiles and missile defense systems, including missiles, KVs, and HCMs.

24.     Defendant, Aerojet is a Delaware corporation headquartered at 222 N. Pacific Coast Highway, Suite 500, El Segundo, California 90245.  Aerojet is an aerospace and defense company that specializes in researching, developing, and manufacturing advanced power, propulsion, and armament systems.  A major portion of Aerojet's business is devoted to developing and producing liquid and solid rocket propulsion systems for defense and civil space applications.  Aerojet is also a leader in developing cutting-edge hypersonic propulsion technologies, including air-breathing hypersonic propulsion systems and solid propellant boost motors for hypersonic weapon systems.  Aerojet reported net sales of over $2 billion in 2020, approximately 96 percent of which were sales made, directly or indirectly, to the U.S. Government, including to the military services, the Missile Defense Agency ("MDA"), and the National Aeronautics and Space Administration.  As a tier-one subcontractor, Aerojet usually is a direct supplier to a prime contractor customer such as Lockheed.  Aerojet considers its remaining performance obligations, or "backlog," to be a key metric of its financial performance. In October 2021, Aerojet's backlog totaled approximately $7 billion and its funded backlog (amounts for which funding has been authorized by a customer and purchase order received), totaled approximately $3.2 billion.

25.     Pursuant to an Agreement and Plan of Merger dated December 20, 2020, Lockheed agreed to acquire 100 percent of the issued and outstanding voting securities of Aerojet for approximately $4.4 billion.

26.     On January 25, 2022, by a 4-0 vote, the Commission found reason to believe that the Proposed Acquisition would substantially lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, and Section 5 of the FTC Act, 15 U.S.C. § 45.  On January 25, 2022, the Commission commenced an administrative adjudication proceeding to determine

whether the Proposed Acquisition is unlawful.  An administrative trial before an Administrative

Law Judge, is scheduled to begin on June 16, 2022.  The ongoing administrative trial provides a

forum for all parties to conduct discovery, followed by a merits trial with up to 210 hours of live

testimony.  *See* 16 C.F.R. § 3.41.  The decision of the Administrative Law Judge is subject to

appeal to the full Commission, which, in turn, is subject to judicial review by a United States

Court of Appeals.

      27.     In authorizing the filing of this complaint, the Commission has determined that

(1) it has reason to believe the Proposed Acquisition would violate the Clayton Act and the FTC

Act by substantially lessening competition in one or more lines of commerce, and (2) an

injunction of the Proposed Acquisition pending the resolution of the Commission's

administrative trial and any appeals will promote the public interest to minimize harm to national

security, customers and the American public, and to preserve the Commission's ability to grant

an adequate remedy if it concludes, after the administrative trial, that the Proposed Acquisition is

unlawful.

## **INDUSTRY BACKGROUND**

      28.     The Relevant Products are defense-specific products for which DoD is generally

the sole customer.  DoD's process for buying a new weapon system is lengthy, highly complex,

governed by multiple sets of regulations, and involves numerous decision makers.  Each new

weapon system must go through a formal three-step process, which includes (1) identifying the

specific military requirements for the new weapon system; (2) planning, programming,

budgeting, and execution; and (3) determining how the weapon system will be developed and

acquired.  This weapon system procurement program—from initial concept to full production of

the weapon system—occurs over a number of years.

29.     Under the DoD acquisition system, the weapon system integrator or "prime contractor" is typically responsible for designing the new weapon system, assessing the trade-offs inherent in potential designs, maturing the enabling technologies, and planning development, production, and sustainment programs to achieve an operational weapon that meets DoD's performance, cost, and schedule requirements.  Because of the enormous complexity of modern weapon systems, only a small number of firms possess the necessary mix of technical, managerial, and industrial capabilities to act as a prime contractor for most DoD acquisition programs for any of the Relevant Products.  In the acquisition phase, some common factors that DoD considers before awarding a competitive prime contract include technical capability, cost/price, schedule risk, and the bidders' past performance on similar programs.

30.     The prime contractor is, in turn, responsible for selecting subcontractors to manufacture components of the integrated weapon system.  These sub-components can vary greatly in complexity and importance.  For the Relevant Products, the propulsion provider is a major subcontractor of particular importance because the propulsion sub-system is one of the critical discriminator technologies that determines the weapon system's performance. Propulsion subcontractor evaluations can be based on a multitude of factors including, but not limited to, capabilities, price, performance, past performance/reputation, risk, and delivery schedule.  As a result, the design and development of a propulsion sub-system entails a close and lengthy collaboration, including the sharing of significant amounts of proprietary, competitively sensitive information, between the input supplier and the prime throughout the entire length of the acquisition program.

31.     The U.S. missile industry is highly concentrated up and down the supply chain. In most cases, there are at most four firms that possess sufficient experience and expertise in

12

designing, developing, and producing missile systems to serve as prime contractors for the Relevant Products: Lockheed, Raytheon, Boeing, and, in some instances, Northrop.  There are at most two firms that can competitively supply the Critical Propulsion Technologies to the prime contractors: Aerojet and Northrop.

## THE RELEVANT ANTITRUST MARKETS

32.     The Proposed Acquisition is likely to lessen competition substantially in multiple relevant product markets, including the design, development, and production of missiles, KVs, and HCMs in the United States.

I.    **The Relevant Product Markets are the Design, Development, and Production of Missiles, KVs, and HCMs**

a.    **The Design, Development, and Production of Missiles is a Relevant Product Market**

33.     The first relevant product market in which to analyze the Proposed Acquisition is no broader than the design, development, and production of missiles.  A missile is a self-propelled, guided munition that flies through or above the atmosphere to strike a target.  Missiles are advanced weapon systems that provide essential national defense capabilities that no other weapon system is as capable of providing.

34.     The U.S. military depends on many different missiles to accomplish various specific missions.  There are three broad categories of missiles: strategic, tactical, and missile defense interceptors ("MDIs").  U.S. military strategic missiles include nuclear-armed ballistic and cruise missiles intended to achieve strategic nuclear deterrence.  These missiles are designed to strike strategic targets at very long ranges.  U.S. military tactical missiles are conventional, typically shorter-range weapons used to engage individual military targets to gain tactical

13

advantage on the battlefield.  MDIs are specialized missiles designed to intercept and destroy incoming ballistic missile threats.

35.     Missiles contain several components that can vary depending on the mission-specific purpose for which the missile is designed.  All missiles, however, contain four principle sub-systems: airframe, guidance and control, armament, and propulsion.

36.     Most missiles employed by the U.S. military use SRMs for propulsion.  The U.S. military also employs a small number of missiles, called "cruise missiles," that use air-breathing jet engines instead of SRMs for primary propulsion.  Cruise missiles, which travel at sub-sonic speeds, are not substitutes in most cases for SRM-powered missiles that can travel at high supersonic and even hypersonic (above Mach 5) speeds.

37.     Missiles have different characteristics and operational capabilities than other weapon systems employed by the U.S. military.  Other munitions—such as gravity bombs, ammunition, mortar rounds, and naval gun rounds—are not close substitutes for most missile applications because they differ substantially from missiles in terms of cost, performance characteristics, and operational capabilities.  For example, missiles are uniquely suited to certain missions such as intercepting fast-moving targets, including hostile aircraft and missiles. Missiles also may permit engagement of targets at greater range than other weapon systems, which allows the U.S. military to strike targets while remaining outside of the effective range of enemy counter-fire weapons.

38.     The U.S. military has not, and likely would not, switch to any substitute product in response to a small but significant and non-transitory increase in the price of any given missile.

14

39.     The design, development, and production of missiles for the U.S. military is a line of commerce and a relevant product market within the meaning of the Clayton Act.

**b.  <u>The Design, Development, and Production of KVs is a Relevant Product Market</u>**

40.     The second relevant product market in which to analyze the Proposed Acquisition is no broader than design, development, and production of KVs.  KVs are essential subsystems of the MDIs used in U.S. ballistic missile defense programs.  The U.S. Ballistic Missile Defense System consists of technology deployed to counter ballistic missile threats using either the force of a direct collision or an explosive warhead to destroy the enemy missile before it reaches its intended target.   Since ballistic missiles have different ranges, speeds, size, and performance characteristics, the Ballistic Missile Defense System utilizes a layered approach that provides multiple opportunities to destroy missiles and their warheads at different altitudes along their flight trajectories.  DoD relies on multiple MDI systems to execute this layered approach for missile defense.

41.     In most U.S. missile defense systems, the MDI consists of one or more SRM-powered boost stage(s) that propel the interceptor through the earth's atmosphere and a KV that is designed to destroy or neutralize the incoming threat.  Launched on the front end of the interceptor, the KV detaches from the interceptor's final booster stage once the interceptor is in range of its intended target, seeks its target, and maneuvers to intercept it.  KVs are typically "hit-to-kill" weapons, meaning that they aim to eliminate the threat by using only the kinetic energy produced by physically colliding with the target.

42.     There are no substitutes for KVs.  All of the ballistic missile defense systems deployed or under advanced development by DoD's MDA and U.S. military services depend on

15

KVs.  As a result, DoD has not, and likely would not, switch to any substitute product in response to a small but significant and non-transitory increase in the price of any given KV.

43.     The design, development, and production of KVs for the U.S. military is a line of commerce and a relevant product market within the meaning of the Clayton Act.

### c.   <u>The Design, Development, and Production of HCMs is a Relevant Product Market</u>

44.     The third relevant product market in which to analyze the Proposed Acquisition is no broader than design, development, and production of HCMs.  A HCM is a hypersonic strike missile powered by an air-breathing hypersonic propulsion system, namely a scramjet engine. The unclassified HCMs currently under development are air-launched cruise missiles that use SRM-powered boost stages to accelerate the HCMs to a sufficiently high speed (approximately Mach 3) at which point scramjet sustainer engines take over to propel the HCMs to their intended targets at hypersonic speeds of Mach 5 or greater.

45.     The development and near-term deployment of hypersonic weapon systems is one of the highest national security priorities for DoD, due, in part, to the need to match or deter the threats posed by recent advances in these technologies by potential adversaries of the United States.  HCMs are one type of hypersonic weapon that DoD is interested in developing because they would provide the U.S. military with important capabilities that would enhance its ability to strike rapidly targets in highly contested environments.  Specifically, HCMs would provide significant advantages over current cruise missiles in terms of speed to target and survivability to attack well-defended targets.  Consequently, Lockheed and other major U.S. defense contractors are prioritizing the acquisition and development of hypersonic technologies to capture

anticipated future business in high growth markets for hypersonic weapon systems, including HCMs.

46.     Lockheed, Raytheon, and Boeing have each won contracts to develop HCMs for the U.S. military and are competing, or likely to compete, for future U.S. military HCM programs.  DoD's Defense Advanced Research Projects Agency awarded Lockheed and Raytheon dual prime contracts to develop competing prototype HCM flight vehicles for the Hypersonic Air-breathing Weapon Concept program.  A U.S. Air Force program, Southern Cross Integrated Flight Research Experiment ("SCIFiRE"), also seeks to develop a HCM that can be launched from ground-attack fighter aircraft.  The SCIFiRE program is in study phase now, and Lockheed, Boeing, and Raytheon were each awarded SCIFiRE preliminary development contracts in 2021. ███████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████  In addition to these two unclassified programs, there are other future HCM programs under consideration by various branches of the U.S. military.  Aerojet is one of only two competitive suppliers of the scramjets necessary to develop successfully HCMs for the U.S. military.

47.     The U.S. military likely would not switch to any substitute product in response to a small but significant and non-transitory increase in the price of any HCM.

48.     The design, development, and production of HCMs for the U.S. military is a line of commerce and a relevant product market within the meaning of the Clayton Act.

**II.**   **The Relevant Geographic Market is the United States**

49.     The relevant geographic area in which to analyze the effects of the Proposed

Acquisition on competition in each of the Relevant Product markets is the United States.

50.     The Relevant Products are purchased almost solely by DoD, which decides which

companies are acceptable suppliers and then funds the development and procurement of these

weapons through appropriations made by Congress.  As a result of federal law, national security,

and other considerations, DoD is unlikely to turn to any foreign producers in the face of a small

but significant and non-transitory price increase by domestic suppliers of missiles, KVs, or

HCMs.

51.     For legal, political, economic, practical, and national security reasons, U.S.

military prime contractors are unlikely to turn to any foreign producers in the face of a small but

significant and non-transitory price increase by domestic suppliers of SRMs, DACS, or

scramjets.

52.     The United States is a relevant geographic market within the meaning of the

Clayton Act.

## ANTICOMPETITIVE EFFECTS

53.     The Proposed Acquisition of Aerojet—the last independent domestic missile

propulsion supplier (and one of only two significant domestic suppliers)—by a leading supplier

of missiles, KVs, and HCMs to the U.S. military is likely to substantially lessen competition for

procurements of these products, which are critical to the national security interests of the United

States, in violation of Section 7 of the Clayton Act, as amended, 15 U.S.C. § 18, and Section 5 of

the FTC Act, as amended, 15 U.S.C. § 45.

18

54.     As a result of the Proposed Acquisition, Lockheed would gain the ability and incentive to deny or degrade competitors' access to Critical Propulsion Technologies, which would increase rivals' costs for these inputs or otherwise disadvantage Lockheed's competitors. The U.S. Government, in turn, would be harmed because the cost of the Relevant Products would likely increase, innovation would be lessened, and quality would be reduced.

55.     The U.S. missile industry is highly concentrated up and down the supply chain, and it has unique characteristics that make it difficult—if not impossible—for prime contractors to switch to alternative suppliers for Critical Propulsion Technologies.  The presence of only two (at most) upstream suppliers and four significant participants (Lockheed, Raytheon, Northrop, and Boeing) in the downstream markets demonstrates the extent to which the Relevant Markets and the related upstream propulsion markets are highly concentrated.  The effect of foreclosure by the combined firm following the acquisition would thus only increase or entrench market concentration.

56.     Per DoD policy, DoD independently assessed the impact of the Proposed Acquisition ███████████████████████████████████████████ ████████████████████████████████████ and concluded that the transaction ██████████████████████████████████████ ███████████████████████████████████████████████ ███████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████

57.     Lockheed feared such foreclosure risk to itself were one of its competing primes to acquire Aerojet.  For example, one Lockheed businessperson concluded, ████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████ ██████████████████████████████████████ ██████████████████████████████████████ ████████████     That defensive rationale for the Proposed Acquisition itself substantiates the criticality of the propulsion products Aerojet supplies and validates the concerns that control of these essential inputs could be wielded effectively to lessen competition by other suppliers of the Relevant Products.

58.     Through its acquisition of Aerojet, Lockheed would gain the ability to foreclose, raise costs for, or otherwise disadvantage, its prime contract rivals that rely on Aerojet's Critical Propulsion Technologies to compete effectively in the Relevant Markets.  Switching propulsion suppliers is prohibitively expensive, and Aerojet's current customers therefore cannot easily switch to Northrop, the only remaining U.S propulsion supplier of SRMs and scramjets, for existing programs.  Moreover, there is no other proven alternative U.S. supplier of DACS to which KV producers could turn.  Nor can primes practicably turn to foreign suppliers for propulsion products for DoD programs.

59.     The Proposed Acquisition will necessarily alter the combined firm's incentives to supply Critical Propulsion Technologies to Lockheed's prime contractor rivals.  Currently, Aerojet has the incentive to supply all potential primes seeking to win DoD contracts in the Relevant Markets to maximize Aerojet's probability of being the Critical Propulsion Technology sub-contractor for the winning prime.  Post-acquisition, however, Lockheed's incentive will

20

change because the total profits earned as a prime for a major weapon system almost always outweigh any foregone profits from supplying propulsion inputs to a rival prime.  As a result, Lockheed would have a strong post-acquisition incentive to monitor, identify, and disadvantage potential threats to its current missile, KV, and HCM programs, as well as future competitive bids.

60.     In many instances, Lockheed will have the ability to lessen competition by withholding Critical Propulsion Technologies from Lockheed's rivals post-acquisition.  DoD's ongoing NGI program embodies the extreme vulnerability of Lockheed's rivals post-acquisition. The NGI program is a significant capability upgrade to the United States' primary homeland defense against attack from hostile intercontinental ballistic missiles.  For the NGI program, every prime involved relies on Aerojet, which is the sole supplier of the critical DACS component for this important missile defense system.  The NGI program alone represents total potential future revenues for the prime contractor of up to $18 billion over the expected life of the program.

61.     Because a weapon system procurement program—from initial concept to full production of the weapon system—occurs over a number of years, there are numerous opportunities for a prime contractor that controls a necessary input to partially foreclose its rivals' access to the input.  Before awarding a prime contract, DoD assesses a number of factors of each potential prime's bid, including technical merits of the design, the technical capability of the prime and its partners, cost/price, schedule risk, and the bidders' past performance on similar programs.  There are numerous mechanisms by which Lockheed could handicap a competitor's performance with respect to each of these factors through a variety of foreclosure strategies for each of the Critical Propulsion Technologies, including:

21

a.      affecting the price of the technology;

b.      affecting the quality of the technology;

c.      affecting the quality of the engineering team for the technology;

d.      affecting the schedule associated with the technology; or

e.      affecting the contract terms for the technology.

62.      These partial foreclosure mechanisms are less detectable and harder to deter than total foreclosure, especially given the often unique design and complex development pathway for each of the Critical Propulsion Technologies.  A given acquisition program for a Relevant Product may have dozens of development milestones, each of which is vulnerable to myriad foreclosure strategies that Lockheed could employ to degrade or delay the performance of a competing prime contractor.  Partial foreclosure by the merged firm appears highly likely, given that Lockheed's competitors in the downstream Relevant Markets cannot compete effectively without access to Aerojet's best experts, technology, and timely delivery commitments.

63.      Apart from complete or partial foreclosure, a combined Lockheed-Aerojet could also raise its rivals' costs for Critical Propulsion Technologies.  Propulsion often comprises a significant portion of the Relevant Product's total bill of materials, which leaves competing primes vulnerable should Lockheed increase the price for the Critical Propulsion Technologies. If Lockheed were to increase the price of Aerojet input products for its prime rivals post-transaction, competition could be lessened in a number of ways: the competing prime could be forced to raise the prices of the downstream Relevant Product to account for increased input costs; it could decide not to compete at all in light of its higher cost position; or foreclosed rivals could have fewer discretionary dollars to invest to win future programs, which, in turn, would decrease competitive pressure on Lockheed.  In addition, by gaining insight into a key cost

component of a rival's anticipated bid, Lockheed may be able to be incrementally less aggressive with respect to its own bid.

64.     The Proposed Acquisition may also impact R&D and innovation.  Lockheed, Aerojet, and other defense contractors currently compete on the basis of innovation, often making decisions to allocate company-sponsored or internal research and development ("IRAD") funds from one project or program to another based on the expected return the company can earn on its IRAD investment.  Currently, an independent Aerojet has the incentive to direct IRAD investment based on the potential return the funds would generate regardless of which prime it is supporting.  Indeed, Aerojet currently maximizes its probability of becoming the winning bidder's supplier by supporting as many competing bidders as possible.  The Proposed Acquisition would alter this dynamic, however, as the combined firm would be incentivized to allocate Aerojet investment dollars for the combined firm's benefit alone, to the detriment of Lockheed's downstream rivals who have long relied on an independent Aerojet's IRAD investments to increase the competitiveness of their prime contract proposals.

65.     The Proposed Acquisition also increases the likelihood of the acquisition, transfer, misuse, and/or mishandling of competitively sensitive, non-public information.  Such an exchange of competitively sensitive information could, in turn, negatively impact current and/or future competitions for the Relevant Products.  Primes and their propulsion sub-contractors, through their collaboration for the competitive pursuit of a given program, often exchange sensitive information about technological advancements, cost, schedule, and business strategies, among other things.  The Proposed Acquisition will give Lockheed access to competitively sensitive business information of rival primes that Aerojet acquired as a supplier of Critical Propulsion Technologies to rival primes.  In contrast to an independent Aerojet, Lockheed would

23

have an incentive to exploit its access to its rivals' proprietary information to gain an advantage in competitions against those rival primes. The Proposed Acquisition also creates the risk that proprietary, competitively sensitive information relating to Northrop's SRM business—Aerojet's only SRM rival—could be unwittingly, or purposefully, transferred to the formerly independent Aerojet, which could disadvantage Northrop in future competitions against Lockheed's newly acquired SRM business.

66.     The Proposed Acquisition would increase entry barriers into the design, development, and production of each of the Relevant Products, making future entry even less likely, timely, and sufficient. If Lockheed were to foreclose supply of the Critical Propulsion Technologies to a potential new downstream entrant post-acquisition, the putative new entrant would likely face substantial development delays as it would need to seek out an alternative propulsion input supplier—if one existed. In the alternative, the new entrant would face the difficult prospect of having to first enter into the design, development, and production of the relevant input product(s)—i.e., Critical Propulsion Technologies—before it could subsequently enter into the downstream market for one of more of the Relevant Products.

I.     **The Proposed Acquisition is Likely to Harm Competition in the Design, Development, and Production of Missiles for the U.S. Military**

67.     Lockheed is the largest supplier of missiles to the U.S. military, serving as a prime contractor for various strategic, tactical, and MDI missile programs. The Proposed Acquisition would provide a combined Lockheed-Aerojet with the ability and incentive to foreclose or otherwise disadvantage Lockheed's prime contractor missile rivals, resulting in competitive harm to the market for the design, development, and production of missiles for the U.S. military, which could inhibit DoD's capability to defend the nation.

68.     Lockheed accounts for approximately ▉ of all dollar sales of tactical missiles, at least ▉ percent of all dollar sales of strategic missiles, and at least ▉ percent of all dollar sales of MDIs to the U.S. military.  Lockheed is the prime contractor for multiple current U.S. military missile programs, including the U.S. Navy's Fleet Ballistic Missile strategic missile system, as well as several tactical missiles, including, among others, Javelin, Hellfire, Guided Multiple Launch Rocket System, Long-Range Anti-Ship Missile, Joint Air to Ground Missile, and Joint Air-to-Surface Standoff Missile.  Lockheed also is the prime contractor for the Terminal High Altitude Area Defense ("THAAD") and Patriot Advanced Capability ("PAC-3") MDIs. Lockheed has been awarded development contracts for the NGI MDI program, as well as for several hypersonic missile and hypersonic missile technology demonstrator programs, including Conventional Prompt Strike, Long Range Hypersonic Weapon, Air-Launched Rapid Response Weapon, Operational Fires, and Tactical Boost Glide.

69.     The relevant market is highly concentrated, with Lockheed competing primarily against three other firms: Raytheon, Boeing, and Northrop to design, develop, and produce missiles for the U.S. military.  Raytheon is the second largest missile supplier to the U.S. military, and its key missile programs include several tactical missiles, such as the Advanced Medium-Range Air-to-Air Missile, AIM-9X, Rolling Airframe Missile/SeaRAM, Griffin, and Standard Missile ("SM")-2 and SM-6.  Raytheon also supplies the SM-3 and SM-6 families of MDIs, as well as a next-generation strategic cruise missile—the Long-Range Stand-Off Weapon. Northrop manufactures one tactical missile: the medium-range air-to-ground Advanced Anti-Radiation Guided Missile.  Northrop has also been awarded a sole-source prime contract for the development of the Ground-Based Strategic Defense strategic missile program, and, along with partner Raytheon, a development contract for the NGI missile defense interceptor program

25

(Lockheed was awarded a competing contract).  Boeing is the prime contractor for MDA's

Ground-based Midcourse Defense ("GMD") program and the Harpoon tactical anti-ship missile.

70.    The design of a missile's propulsion system is driven by the specific performance

requirements and technical constraints imposed by the missile's intended mission(s).  Selecting

the optimal propulsion design is a complex task that requires extensive collaboration between the

engineering teams of the missile prime contractor and the propulsion subcontractor.  Modern

missiles are designed around one of three types of propulsion systems: rockets, turbojets, and

ramjets/scramjets.  Each of these engines has different advantages and disadvantages that must

be weighed to select the optimal propulsion technology for a given missile design.  Most missiles

employ SRMs because they produce high specific thrust.

71.    SRMs are used to provide the primary propulsion for the vast majority of U.S.

military missiles.  The U.S. military currently fields approximately forty missile designs that use

SRMs.  At a basic level, a SRM is a cylindrical casing filled with solid propellant that, when

ignited, expels hot gases through a nozzle to produce thrust.  A typical composite solid

propellant used for SRMs is a mixture of ammonium perchlorate (oxidizer) and aluminum (fuel)

mixed in a binder with other ingredients.  This mixture is cast in the motor case, and, when

cured, produces a rubbery solid propellant that can be stored relatively safely until the motor is

employed.  SRMs are differentiated products that are specially designed for a particular missile

and can vary greatly in size and power, depending on the platform.  Tactical missiles usually

require the smallest motors—ranging in size from about 3 inches up to about 24 inches in

diameter.  Strategic missiles employ larger SRMs of over 40 inches in diameter.  MDIs use

SRMs that generally fall somewhere in between—ranging in size from 10-inch diameter to over

40-inch diameter (in the case of the Ground-Based Interceptor).

26

72.     SRMs are an essential input to almost all current and upcoming U.S. military missile programs.  And all current missile prime contractors, as well as any potential future competitors for future U.S. military missile programs, depend on SRMs for current or future missiles.  There is no substitute product that can be used in place of SRMs for missile propulsion.  SRMs have important advantages over other technologies for missile applications, including, but not limited to, the ability to store the missile safely in a launch-ready state for extended periods of time until needed.  For safety and convenience in handling, among other reasons, SRMs have replaced liquid propellant rocket engines for primary propulsion in modern U.S. missiles.  Because of differences in technological capability and cost, missile prime contractors would not substitute to any other technology in place of SRMs, in the event of a small but significant increase in prices for SRMs.

73.     The Proposed Acquisition will give Lockheed control over a critical input for most missiles—Aerojet's SRM design, development, and production capabilities.  The design, development, and production of high performance SRMs for U.S. military missiles is highly complex and requires specialized skills, as engineers must carefully balance performance against various constraints, such as cost, weight, volume, pressure, and temperature.

74.     Over the past two decades, the number of U.S. companies manufacturing SRMs has consolidated from six to only two: Aerojet and Northrop.  This duopoly accounts for over 90 percent of SRM sales in the United States.  The only other firm selling a significant number of SRMs in the United States is Nammo Raufoss ("Nammo"), a Norwegian company that sells small tactical SRMs to Raytheon for its AMRAAM, Evolved Sea Sparrow, and Naval Strike missiles.  Unique circumstances prompted Raytheon's selection of Nammo as a propulsion provider for these missile systems.  Nammo is not a competitive supplier of SRMs for most U.S.

missile programs, and the company's U.S. presence and capabilities are extremely limited.

Further, as a foreign supplier, Nammo is not preferred by the U.S. Government, especially for

critical next-generation and all classified programs.  Nammo also lacks the breadth of experience

and capabilities Aerojet and Northrop possess across all sizes of SRMs.

75.     The Proposed Acquisition follows other acquisitions of SRM suppliers by missile

prime contractors.  Northrop acquired Orbital ATK, the only other significant U.S. manufacturer

of SRMs in 2018.  Indeed, Lockheed's rationale, in part, for the Proposed Acquisition was that it

presented a █████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████

76.     Aerojet and Northrop compete by constantly looking for innovative ways to

increase SRM performance or lower the cost of their production.  For example, Aerojet is

researching new technologies to ██████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████

77.     For some missiles, there may be no close substitutes for Aerojet's SRMs.  Even if

there were, switching, in and of itself, would impose a large cost on Aerojet's SRM customers.

Where Northrop offers a competitive alternative, partial or complete foreclosure by Lockheed

would likely still result in competitive harm, because in those situations, Northrop could use its

increased leverage as the customer's only option available to extract higher prices for its SRMs.

78.     The Proposed Acquisition would give the combined firm the ability to foreclose

missile system prime contractor competitors by denying them access to Aerojet's SRMs or by

making pricing, personnel, scheduling, investment, design, and other decisions that disadvantage those competitors.

79.     The Proposed Acquisition would also give the combined firm the incentive to use foreclosure strategies to harm Lockheed's missile prime contractor competitors.  Lockheed views missiles as a core product area and an engine of future profit growth.  Post-acquisition, Lockheed would have a substantial incentive to engage in foreclosure strategies that give Lockheed an advantage in competing for a new missile prime contract because the expected profits from winning such a bid typically far exceed the foregone profits from supplying Aerojet SRMs to rival prime contractor bidders.

80.     If Lockheed were to withhold effective access to its in-house Aerojet SRMs post-acquisition, or increase the price of those SRMs, to its prime contractor competitors, competition would be lessened because the foreclosed prime contractors would be forced to raise the prices of their missile systems, decide not to compete, or invest less aggressively to win missile programs, which, in turn, would decrease or eliminate competitive pressure on Lockheed, leading to an increase in price and/or decrease in quality or innovation.

## II.    The Proposed Acquisition is Likely to Harm Competition in the Design, Development, and Production of KVs

81.     The Proposed Acquisition would result in a combined firm with the ability and incentive to engage in foreclosure strategies targeting Lockheed's rivals in the market for the design, development, and production of KVs for the MDA and U.S. military.  By acquiring Aerojet, Lockheed would gain control over the only established and proven supplier of DACS, a critical input for KVs.

82.     Historically, three firms have competed to design, develop, and produce KVs for U.S. missile defense systems: Lockheed, Raytheon, and Boeing.  Lockheed supplies the KVs for the THAAD system and has won development contracts for other KVs, including the multiple kill vehicle ("MKV") and Multi Object Kill Vehicle ("MOKV") programs.  Raytheon produces the current KVs used on the GMD and SM-3 missile defense systems and has won contracts relating to other KVs, including MKV and MOKV.  Boeing is the prime contractor for the current GMD system and has experience developing other KVs including designs for the Redesigned Kill Vehicle, MKV, and MOKV programs.  Each of these competitors, or potential competitors, in turn, depend on Aerojet for DACS, which are a critical input to a KV.

83.     DACS are advanced, high performance propulsion systems used to provide fast and precise maneuvering capabilities for KVs.  DACS use divert thrusters, which create forceful pulses to quickly and accurately change the KV's trajectory with respect to the target, and smaller attitude control thrusters, which provide very low thrust to make finer pitch, roll, and yaw adjustments to maintain or adjust the KV's orientation.

84.     DACS can be designed to utilize either solid or liquid propellant depending on the requirements of the specific missile defense system.  Solid DACS ("SDACS") are favored for certain applications, such as deployment on U.S. Navy ships, because the propulsion system is safer to store and maintain.  Liquid DACS ("LDACS"), however, can provide higher performance that may be required for a specific KV mission profile.  In heritage SDACS, the solid propellant would continuously burn in a single pulse once ignited.  Aerojet developed innovative technologies, however, such as throttling solid propellant DACS ("TDACS") or extinguishing solid propellant DACS ("EDACS" or "extinguishing TDACS") that are able to narrow the performance gap between SDACS and LDACS.

85.     There is no substitute for DACS, which are an essential component of most KV designs.

86.     Aerojet is the only current supplier of DACS for U.S. missile defense programs. Aerojet also possesses the most advanced DACS technology and development know-how of any potential U.S. supplier, gained through its performance on multiple past and present DACS programs.  Aerojet provides the LDACS used for Raytheon's exo-atmospheric kill vehicle as well as for Lockheed's THAAD KV.  Aerojet also supplies the TDACS for Raytheon's SM-3 Block IB KV and high divert TDACS for Raytheon's SM-3 Block IIA KV.  Orbital ATK (which Northrop acquired in 2018) is the only other company that has supplied DACS for U.S. missile defense programs.  Orbital ATK supplied a simple design SDACS for Raytheon's SM-3 Block IA until 2014.  Aerojet displaced Orbital ATK as a DACS supplier for the SM-3 Block IB and Block IIA programs, and Northrop ██████████████████████████████████ ███████  As a result, Northrop is relying on Aerojet—rather than in-house Orbital ATK DACS technology—to supply DACS for Northrop's entry in the competition to develop the NGI.

87.     Aerojet is currently supporting all of the prime contractors currently competing or preparing to compete for forthcoming missile defense programs.  Aerojet supported all three prime contractor teams (Lockheed, Boeing, and Northrop/Raytheon) that competed for initial development contracts for MDA's NGI program.  All three teams submitted design proposals based on Aerojet DACS for the KVs.  In March 2021, MDA awarded dual contracts to Lockheed and the Northrop/Raytheon team with an estimated combined maximum value of $1.6 billion through fiscal year 2022.  The timing on a final down-select to one prime contractor has not been announced but is anticipated to occur ████████████████

31

88.     In addition, Lockheed's rivals will require Aerojet DACS technology and support for future DoD programs intended to defend against attacks by hypersonic missiles, including, but not limited to, MDA's Glide Phase Interceptor program.  In November 2021, MDA awarded Lockheed, Northrop, and Raytheon contracts for the accelerated concept design phase of the program, which is aimed at developing MDIs designed for deployment on U.S. Navy Aegis Ballistic Missile Defense destroyers to counter hypersonic weapons during their glide phase of flight.  All of these firms will likely require Aerojet's DACS technology for their designs.

89.     The Proposed Acquisition would give the combined firm the ability to foreclose rival KV competitors by denying them access to Aerojet's essential DACS technology or by making pricing, personnel, scheduling, investment, design, or other decisions that disadvantage those competitors.

90.     The Proposed Acquisition would also give the combined firm the incentive to use foreclosure strategies to harm competing KV suppliers.  Post-acquisition, Lockheed would have a substantial incentive to engage in foreclosure strategies that give Lockheed an advantage in competing for a prime contract for a new missile defense system utilizing KVs because the expected profits from winning such a bid typically far exceed the foregone profits from supplying DACS to the winning bidder.

91.     If Lockheed were to withhold effective access to its in-house Aerojet DACS technology post-acquisition, or increase the price of those DACS, to its prime contractor competitors, competition would be lessened because the foreclosed prime contractors would be forced to raise the prices of their KV or missile defense systems, decide not to compete, or invest less aggressively to win missile defense system programs, which, in turn, would decrease

32

competitive pressure on Lockheed, leading to an increase in price and/or decrease in quality or innovation.

### III.   The Proposed Acquisition is Likely to Harm Competition in the Design, Development, and Production of HCMs

92.    The Proposed Acquisition would result in a combined firm with the ability and incentive to engage in foreclosure strategies targeting Lockheed's rivals in the market for the design, development, and production of HCMs for the U.S. military.

93.    Scramjets, also referred to as "dual mode ramjets," are an essential enabling technology for development of HCMs.  There is no substitute product that could be used in place of a scramjet in current or future U.S. military HCM development programs.

94.    A scramjet is a type of air-breathing jet engine.  Unlike rocket motors, air-breathing jet engines draw upon oxygen in the atmosphere for combustion, eliminating the need to carry oxidizer in addition to fuel.  As a result, air-breathing engines are more efficient than rocket motors, enabling a missile powered by an air-breathing engine potentially to travel longer distances.  Scramjets are a critical enabling technology for HCMs and other potential future reusable hypersonic vehicles because the air-breathing turbojet engines that power current sub-sonic cruise missiles are incapable of propelling a vehicle to hypersonic speeds.

95.    A scramjet is a technologically advanced type of high-performance ramjet engine.  A ramjet uses the high pressure generated by the vehicle's forward motion to compress incoming air, eliminating the turbines used in a conventional turbojet engine.  A ramjet engine slows the incoming air to subsonic speed before it enters the combustor where liquid fuel is injected into the airflow and ignited to produce additional thrust.  In a scramjet engine, however, the airflow

33

travels at supersonic speed through the combustion chamber—a design that poses several significant technical challenges.  Scramjets are the only air-breathing engines capable of propelling a missile to hypersonic speeds in excess of Mach 5.

96.     Not only is scramjet technology necessary to produce an HCM, but the designs of the scramjet engine and the missile or other flight vehicle are tightly integrated and interdependent.  Simply put, as one Lockheed executive indicated, the ███████████████████ ████████████████████████  The necessity for close collaboration between the propulsion provider and missile prime contractor heightens the potential for competitive harm to result from the Proposed Acquisition, as it would increase the volume of competitively sensitive, non-public information that must be shared and amplify Lockheed's ability to undermine its rivals' efforts through foreclosure strategies.

97.     Aerojet and Northrop are the only two viable suppliers of scramjets for U.S. military HCM applications.  Aerojet and Northrop have both gained extensive technical knowledge and expertise through their participation on several current and past DoD programs. The development of hypersonic propulsion technologies requires specialized expertise and technology, including the development of advanced materials technology and special analytical tools.  Both companies have achieved successful flight tests of scramjet-powered hypersonic flight vehicles.  No other U.S. company has scramjet development experience and capabilities commensurate with Aerojet and Northrop.

98.     Three prime contractors (Lockheed, Raytheon, and Boeing) are currently developing HCMs, and they all rely on Aerojet or Northrop scramjet engines to support their

efforts.  These primes are in a race to develop HCMs and to position favorably their companies to secure lucrative potential future production contracts for the missiles.

99. 

100.    The Proposed Acquisition would give the combined firm the ability to foreclose Boeing and other future rival HCM competitors by denying them access to Aerojet's scramjet technology or by making pricing, personnel, scheduling, investment, design, and other decisions that disadvantage Boeing or other competitors.

101.    The Proposed Acquisition would also give the combined firm the incentive to use foreclosure strategies to harm competing HCM suppliers.  Post-acquisition, Lockheed would have a substantial incentive to engage in foreclosure strategies that give Lockheed an advantage in competing for an HCM prime contract because the expected profits from winning such a bid would exceed the foregone profits from supplying scramjets to the winning bidder.

102.    If Lockheed were to withhold effective access to Aerojet's scramjet technology, or increase the price of those scramjets, to Lockheed's prime contractor competitors, competition would be lessened because the foreclosed prime contractors would be forced to raise the prices of their HCMs, decide not to compete, or invest less aggressively to win future HCM programs,

which, in turn, would decrease or eliminate competitive pressure on Lockheed, leading to an increase in price and/or decrease in quality or innovation.

## LACK OF COUNTERVAILING FACTORS

103.    Defendants cannot demonstrate that entry or expansion of products in the Relevant Markets that would not rely upon Critical Propulsion Technologies would be timely, likely, or sufficient in magnitude, character, and scope to deter or counteract the anticompetitive effects of the Proposed Acquisition.  Defendants also cannot demonstrate the entry of substitutes for Aerojet's Critical Propulsion Technologies would be timely, likely, or sufficient in magnitude, character, and scope to deter or counteract the anticompetitive effects of the Proposed Acquisition.  Successful entry into the design, development, and production of each of the Relevant Products, as well as to each of the Critical Propulsion Technologies, would be difficult, time consuming, and costly.  Entry requires specialized know-how, advanced technology, skilled engineers, and specialized equipment and facilities.

104.    Defendants cannot demonstrate substantiated, verifiable, cognizable, and merger-specific efficiencies that would reverse the Proposed Acquisition's likely significant anticompetitive effects in the Relevant Markets.  Nor can Respondents demonstrate that any elimination of double marginalization would offset the harm of this anticompetitive acquisition.

## VIOLATION

## COUNT I – ILLEGAL ACQUISITION

105.    The allegations of Paragraphs 1 through 104 above are incorporated by reference.

106.    The Proposed Acquisition, if consummated, would be likely to lessen competition substantially in interstate trade and commerce in each of the markets for (1) missiles, (2) KVs, and (3) HCMs throughout the country in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

## LIKELIHOOD OF SUCCESS ON THE MERITS, BALANCE OF EQUITIES, AND NEED FOR RELIEF

107.    Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), authorizes the Commission, whenever it has reason to believe that a proposed acquisition is unlawful, to seek preliminary injunctive relief to prevent consummation of the acquisition until the Commission has had an opportunity to adjudicate the acquisition's legality in an administrative trial.  In deciding whether to grant relief, the Court must balance the likelihood of the Commission's ultimate success on the merits against the public equities.  The principal public equity weighing in favor of issuance of preliminary injunctive relief is the public interest in effective enforcement of the antitrust laws.  In this case there is also a compelling public interest in avoiding harm to national security. Private equities affecting only Defendants' interest cannot defeat a preliminary injunction.

108.    The Commission is likely to succeed in proving that the effect of the Proposed Acquisition may be substantially to lessen competition or tend to create a monopoly in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18, or Section 5 of the FTC Act, 15 U.S.C § 45.  In particular, the Commission is likely to succeed in demonstrating, among other things, that:

   a.   The Proposed Acquisition would have anticompetitive effects in the United States, in a relevant product market no broader than the research, development, production, and sale of missiles;

b.  The Proposed Acquisition would have anticompetitive effects in the United States, in a relevant product market no broader than the research, development, production, and sale of KVs;

c.  The Proposed Acquisition would have anticompetitive effects in the United States, in a relevant product market no broader than the research, development, production, and sale of HCMs;

d.  Substantial and effective entry or expansion is difficult and would not be timely, likely, or sufficient to offset the anticompetitive effects of the Proposed Acquisition; and

e.  The efficiencies and procompetitive benefits asserted by Defendants do not justify the Proposed Acquisition.

109.    Preliminary relief is warranted and necessary.  Should the Commission rule, after the full administrative trial that the Proposed Acquisition is unlawful, reestablishing the status quo ante if the Proposed Acquisition has already occurred in the absence of preliminary relief would be extremely difficult.  Moreover, in the absence of relief from this Court, substantial harm to competition would likely occur in the interim, even if suitable divestiture remedies were obtained later.  Indeed, the public interest in preventing even interim harm to competition is greater than in the ordinary case where, as in this case, the Relevant Markets are of vital interest to the national defense.

110.    Accordingly, the equitable relief requested here is in the public interest. Wherefore, the Commission respectfully requests that:

a.  Lockheed and Aerojet be preliminarily enjoined from taking any further steps to consummate the Proposed Acquisition and any related transactions, stock assets, or acquisition of any other interests of one another either directly or indirectly; carrying out any other agreement, understanding, or plan by which Lockheed would acquire control over Aerojet or any of its assets;

b.  Retain jurisdiction and maintain the status quo until the administrative trial that the Commission has initiated is concluded; and

c.  Award such other and further relief as the Court may determine is appropriate, just, and proper.

Dated: January 25, 2022

Of Counsel:

HOLLY VEDOVA
Director
Bureau of Competition
Federal Trade Commission

REILLY DOLAN
Acting General Counsel
Federal Trade Commission

STEPHEN MOHR (D.C. Bar 982570)
Acting Assistant Director

JAMES WEISS
Deputy Assistant Director

LISA DEMARCHI SLEIGH (D.C. Bar 485853)
M. HASAN AIJAZ
YAN GAO
ANDREW HEIMERT (D.C. Bar 456441)
JACQUELINE MENDEL (D.C. Bar 440752)
ROBERT SANBORN (D.C. Bar 888242131)
CATHERINE SANCHEZ
CHRISTINE TASSO (D.C. Bar 985499)
JAMES SOUTHWORTH
NICHOLAS WIDNELL (D.C. Bar 439474)

Attorneys
Federal Trade Commission
Bureau of Competition

Respectfully Submitted,

JONATHAN LASKEN
D.C. Bar 997251
Senior Trial Counsel
Federal Trade Commission
Bureau of Competition
600 Pennsylvania Ave., N.W.
Washington, D.C. 20580
Telephone: 202-326-2064
Email: jlasken@ftc.gov
*Attorney for Plaintiff Federal Trade Commission*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 25st day of January, 2022, I served the foregoing on the following counsel via electronic mail:

Charles Loughlin
Hogan Lovells US LLP
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004
(202) 637-5661
chuck.loughlin@hoganlovells.com

Jon Dubrow
McDermott Will & Emery LLP
500 North Capitol St., NW
Washington, DC 20001
(202) 756-8122
jdubrow@mwe.com

*Counsel for Lockheed Martin Corporation*

Eric Mahr
Freshfields Bruckhaus Deringer US LLP
700 13th St., NW
Washington, DC 20005
(202) 777-4545
Eric.Mahr@freshfields.com

Meghan Rissmiller
Freshfields Bruckhaus Deringer US LLP
700 13th St., NW
Washington, DC 20005
(202) 777-4514
Meghan.Rissmiller@freshfields.com

*Counsel for Aerojet Rocketdyne Holdings, Inc*

Jonathan Lasken
Counsel for Plaintiff Federal Trade Commission